**Jimmy ORTIZ, Appellant,**

v.

**Euell JETER, Appellee.**

**No. 15038.**

Court of Civil Appeals of Texas, San Antonio.

April 12, 1972.

Rehearing Denied May 10, 1972.

CADENA, Justice.

This is an appeal by Jimmy Ortiz, defendant below, from a judgment permanently enjoining him from violating a restrictive covenant prohibiting the use of his property for other than residential purposes. The attempt by plaintiff, Euell Jeter, to terminate existing violations of the restriction by three other defendants, Victor Lange and Mr. and Mrs. E. D. Hirsch, was unsuccessful because the trial court found that, as to these three defendants, plaintiff and his predecessors in title had been guilty of laches. No appeal has been taken from this portion of the judgment.

The lots in question are situated within the Peel Addition to the City of Pleasanton. The subdivision consists of approximately 90 lots, all but 26 of which are restricted to residential use by restrictions imposed in 1952 and recorded in the office of the County Clerk of Atascosa County. Of the unrestricted lots, 24 lie along the northern and eastern edges of the subdivision, several blocks from the lots owned by plaintiff and defendant, and the record does not disclose the use to which these 24 lots are being put.

The southern edge of the subdivision consists of a tier of 15 lots, all of which front on, and lie along the northern edge of, U.S. Highway 97, which runs from the southwestern corner of the subdivision in a northeasterly direction. Lots 53 and 54, which are vacant and unrestricted, lie at the southwestern corner of the subdivision, at the intersection formed by the highway and Lantana, a residential street. Directly north of these two unrestricted lots is restricted lot 52, which faces on Lantana.

Along the northern edge of the highway between Lantana, on the west, and Lullwood, another residential street on the east, lie restricted lots 71, 72, 73, 74, 75, 76 and 77. Between Lullwood and another residential street, Greenlawn, lie lots 78, 79, 80, 81 and 82, all of which front on the

Levey & Goldstein, Abe San Miguel, San Antonio, for appellant.

highway and are subject to the restrictions. Lot 19, which is the southeastern corner of the subdivision, lies at the intersection of Lullwood and the highway, and is unrestricted.

The accompanying sketch, which is not drawn to scale, depicts the southern portion of the subdivision in a manner believed to be accurate enough for the purposes of this opinion.

[A5729]

Defendant purchased lots 71 and 72, at the intersection of the highway and Lantana, in 1967, for the purpose of using such lots as a site for a drive-in grocery. He had no actual notice of the restrictions. Plaintiff is the owner of lots 55 and 56,

which front on Lantana. Lot 55 lies north of defendant's lots, and is separated from them only by an alley which is 11 feet wide.

Of the 15 lots which front on the highway, three (lots 53 and 54 at the southwestern corner of the subdivision, and lot 19, at the southeastern corner) are unrestricted. Of the 12 restricted lots, the evidence discloses that three (defendant's lots 71 and 72, and lot 74) are vacant. There are residential structures, according to the evidence, on three of these lots (lot 73 and lots 79 and 80), but these residential structures are being partially used for business purposes. Three lots are being used exclusively for business purposes (lots 75, 76 and 77), and one is being used for the storage of equipment (lot 78). The record does not clearly indicate the use which is being made of the other two lots (lots 81 and 82).

On lots 73 and 74, which are immediately to the east of defendant's vacant lots, is a residential structure, one-half of which houses a three-operator beauty shop, complete with an outside sign advertising the business, while the other half is used for residential purposes. Lot 75 is vacant.

On lot 76 Victor Lange, one of the original defendants, has operated a "freight office" for several years. There is no residential structure on this lot. The only structure is a building with a floor space of 2,400 square feet, 200 square feet of which are used by Lange as his office. The remaining 2,200 square feet of this building are used as a warehouse. This building is about 200 feet from plaintiff's property. No part of lot 76 is being used for residential purposes.

Mr. and Mrs. Hirsch, two of the original defendants, have operated a credit bureau and collection agency on lot 77 ever since they purchased the lot in 1967. Prior to 1967, lot 77 was the site of a drive-in grocery, which had taken the place of a wholesale oil distributing business. Appar-

ently, no part of this lot is being used for residential purposes.

Lots 78, 79 and 80, east of Lullwood, have been owned by Glenn Keeney since 1959. For some time after 1959, he used the lots as the site for his "oil well servicing" business, and kept oil well machinery and equipment on the premises. Two "high" buildings which Keeney built on the property are still there. While he was in this business, he maintained on these lots a shop for reworking oil field equipment and kept his trucks there. At the time of the trial, Keeney was no longer in this business. His residence is located on lots 79 and 80, but he still uses part of his land for the storage of "equipment," the exact nature of which is not disclosed by the evidence. He uses part of his home as his office, from which he operates a cattle-selling business. This commercial use of the residence is proclaimed by an outside sign. No cattle are kept on these three lots.

At the time that plaintiff purchased lots 55 and 56 in 1967, he was aware of the existence of the businesses, as described in the four preceding paragraphs, which were being operated on the border lots. However, according to his testimony, he did not then know that the lots along the highway were subject to residential-use-only restrictions. At that time, Keeney was still engaged in the business of servicing and reworking oil field equipment. Plaintiff learned that such commercial use of the border lots was in violation of existing restrictions about three months after he moved into his home on lots 55 and 56, but he took no action at that time because, according to his testimony, such commercial operations did not affect his use and enjoyment of his land for residential purposes.

He filed this suit against Ortiz, Lang, and Mr. and Mrs. Hirsch when he discovered that Ortiz was planning to operate a drive-in grocery on lots 71 and 72. He did not join Mrs. Davidson, who operates the beauty shop on lots 73 and 74, because the

operation of the beauty shop was not "hurting anybody."

Defendant testified that at the time he purchased lots 71 and 72 in 1969, he believed that the lots could be used for commercial purposes because he noticed the existence of commercial enterprises "all along the highway," including the commercial development of the land which lies south of the highway. The land south of the highway is not a part of the Peel Addition and is unrestricted. There is evidence to support the conclusion that defendant learned that lots 71 and 72 were restricted to residential use when he first began to haul in dirt for the purpose of raising the level of these lots to that of the surrounding property. He continued his preparations for the construction of the drive-in grocery until he received a letter from plaintiff's attorney. At that time, defendant had cleared and levelled the land, and had constructed at least a portion of the foundation for his proposed building, all at a cost of about $1,600.00. There is no evidence indicating the amount he had spent when he was first told of the existence of the restrictions by plaintiff.

Defendant first contends that plaintiff is not entitled to enforce the restriction against lots 71 and 72 because of the failure by plaintiff and those under whom he claims to object to the previous use of the lots fronting on the highway for non-residential purposes.

■ It is, of course, well settled that restrictions on the use of land may become unenforceable because the owners of protected lots have remained inactive in the face of prior violations of the agreements. In cases where enforcement of restrictions has been denied because of prior uncontested violations, the courts have spoken in terms of acquiescence, waiver, estoppel, abandonment, and, sometimes, changed conditions.[1] No serious effort has been made by most courts to delineate the contours of the various doctrines, and where enforcement is denied because of prior violations, the various doctrines are used almost interchangeably.[2] The doctrine of changed conditions, perhaps, should be limited to cases where the changed circumstances are the result of developments outside the protected area, since, if the changed conditions are the result of violations within the restricted area, one or more of the other doctrines would seemingly be applicable.

The Texas courts have, with a great degree of consistency, held that the mere fact that the complaining party did not object to previous violations of the restrictions will not bar his right to enjoin threatened violations where the prior violations were "trivial" in the sense that they did not materially affect his use and enjoyment of his property. Stewart v. Welsh, 142 Tex. 314, 178 S.W.2d 506 (1944); First State Bank of Corpus Christi v. James, 471 S.W.2d 868 (Tex.Civ.App.—Corpus Christi 1971, no writ); Davis v. Hinton, 374 S.W.2d 723 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.); Barham v. Reames, 366 S.W.2d 257 (Tex.Civ.App.—Fort Worth 1963, no writ).

In this case the trial court found that the violations of the restrictions by owners of lots fronting on the highway were trivial in character with respect to their effect on plaintiff's use and enjoyment of his lots for residential purposes. Unless this finding is, as defendant insists, contrary to the overwhelming weight and preponderance of the evidence, it requires that we reject his first challenge to the propriety of granting the injunction in this case.

There is very little evidence in the record concerning the volume of business

---

1. The familiar doctrine of laches is not applicable here because the essential elements, delay by plaintiff coupled with disadvantage to the defendant, are completely lacking.

2. An attempt to give precise meanings to the various terms has been made by the American Law Institute. 5 Restatement, Property, Sections 568–64 (1944).

enjoyed by the beauty shop, the freight office, the credit and collection agencies, or the cattle selling business. Mrs. Hirsch estimated that about three cars an hour came to the beauty shop. She based this conclusion on the fact that the shop employs three operators and "they take care of a lady an hour." Lange testified that the "traffic in and to and out of" the beauty shop is greater than the number of people who call at his freight office. Mrs. Hirsch testified that about five cars a day came to her place of business. There is no testimony concerning the activity generated by the fact that Keeney uses his home as an office from which he conducts his business of selling cattle. The only means of access to the various businesses is from the highway, and there is nothing in the record to indicate any activities on the rear portion of the border lots which would materially affect the use of plaintiff's lots for residential purposes.

The burden was on defendant to prove that the prior violations were substantial in nature and materially affected the use of plaintiff's land for residential purposes. Lee v. Powers, 446 S.W.2d 938 (Tex.Civ.App.—Houston 14th Dist. 1969, no writ); Davis v. Hinton, supra, 374 S. W.2d at 727. We cannot say that the testimony outlined in the previous paragraph, especially when it is remembered that plaintiff testified that the prior violations did not materially affect him, did more than raise a question of fact which the trial court resolved in favor of plaintiff.

Several witnesses testified that the border lots were not suitable for residential use. But the fact that a lot has become unsuitable for the use to which it is restricted does not make it inequitable to enforce the restriction against the owner of that lot. The equities favoring that particular lot owner constitute but one facet of the judicial inquiry. These equities must be weighed against those favoring the lot owners who wish to preserve the residential character of the area. Cowling v.

Colligan, 158 Tex. 458, 312 S.W.2d 943 (1958). In any event, there was testimony to the effect that the border lots, including defendant's were suitable for residential use.

When the conditions were imposed in 1952, Highway 97 was a narrow two-lane highway. It was subsequently widened into a four-lane highway which, at the time of trial, carried a volume of traffic which averaged about 4,000 vehicles per day. In addition, as already indicated, the unrestricted land across the highway may fairly be described as commercial property on which several businesses, including a lumber yard, a liquor store and a nursing home, are located. "Further down Highway 97" there is a trailer park, but we are left in the dark concerning the location of the trailer park with reference to the restricted lots in the Peel Addition.

The commercial development of land which lies outside a protected residential subdivision can furnish no basis for enjoining violations of restrictions within the protected area in the absence of a showing that such non-residential development has brought about a change of conditions so great ". . . that it is no longer possible to secure in a substantial degree the benefits sought to be realized . . ." by the restrictions within the protected subdivision. Cowling v. Colligan, supra, 312 S.W.2d at 945. The burden of establishing this fact was on the defendant. Abernathy v. Adoue, 49 S.W.2d 476 (Tex. Civ.App.—Beaumont 1932, no writ). The language of Chief Justice Murray, speaking for this Court in Lebo v. Johnson, 349 S.W.2d 744, 751 (1961, writ ref'd n. r. e.), is pertinent:

"In every growing city it is inevitable that sooner or later commercial and business areas must come face to face with residential areas, and it is then that the restrictions are most valuable to the interior lot owners. It is when the outer tier of lots become more valuable for commercial and business purposes that

the restrictions come into play and prevent the residential area from being taken over by commercial establishments.

\* \* \* \* \* \*

"The front tier of lots must bear the brunt of the onslaughts of business and commerce, otherwise there would be started a system of gradual encroachment that might swallow up the entire residential area. The other tiers of lots might fall like ten pins, once the encroachment of commerce and business was begun. One of the best places to hold the encroachment of business and commerce upon a restricted residential area is at a highway or street."

See also Faubian v. Busch, 240 S.W.2d 361, 367 (Tex.Civ.App.—Amarillo 1951, writ ref'd, n. r. e.) and Bethea v. Lockhart, 127 S.W.2d 1029, 1032–1034 (Tex.Civ.App. —San Antonio 1939, writ ref'd).

■ The evidence in this case fails to establish that the original plan to make the Peel Addition a residential area has been frustrated. Except as to the tier of lots bordering on the Highway, the restrictions appear to be accomplishing their purpose. It is also significant that the commercial uses outside the subdivision as well as the violations within the Peel Addition existed at the time that defendant purchased lots 71 and 72. See Lebo v. Johnson, supra, 349 S.W.2d at 750; Scaling v. Sutton, 167 S.W.2d 275, 280 (Tex.Civ.App.—Fort Worth 1943, writ ref'd w. m.).

Finally, defendant asserts that plaintiff is not entitled to enforce the restrictions against lots 71 and 72 because, at the time that plaintiff purchased his lots, he knew of the existence of businesses on some of the border lots and did not know that such lots were restricted to residential use only.

Is it necessary, in order for a purchaser of land in a restricted subdivision to have the right to enforce restrictive covenants, that he have notice of the existence of such covenants at the time that he purchased his land? There are statements which indicate that in order for the benefit of such a covenant to pass with the benefitted land, the purchaser of such land must have had notice of the restriction. "Those equities must be weighed against the equities favoring the lot owners who, *having acquired their property on the strength of the restriction,* wish to preserve the residential character of the area." Cowling v. Colligan, supra, 312 S.W.2d at 946 (emphasis ours). But there is language that actual knowledge of the existence of the restriction, and reliance on the restriction, at the time of purchase are not conditions precedent to the right to enforce the covenants. "Every person who became a purchaser of a lot took at least with constructive notice of the restrictions, became bound thereby and became vested with the rights and benefits flowing therefrom." Cornett v. City of Houston, 404 S.W.2d 602, 605 (Tex.Civ.App.—Houston 1966, no writ). Neither of these statements seems relevant to the disposition of the case in which it was made.

The answer to the question would seem to depend on whether enforcement of the covenant is granted as a contract right or as a property right. In the former case, knowledge should be essential, except in jurisdictions adopting the third party beneficiary theory of enforcement, since an implied assignment of a contractual right requires that the assignee realize that he is acquiring certain rights along with the land itself. But if enforcement is based on the fact that the restrictive agreement creates a property right, the subsequent purchaser of the benefitted land should not be required to have knowledge of the benefit since an equitable easement appurtenant to the benefitted land is involved.

It appears that several courts require knowledge on the part of the subsequent purchaser without discussing the basis for their decisions. Judd v. Robinson, 41 Colo. 222, 92 P. 724 (1907); Solar v. Ruehlman, 33 Ohio App. 224, 168 N.E. 861 (1929).

It is apparent that the Texas courts have adopted the view that restrictions are enforced on the theory that they create equitable servitudes upon land, since such restrictions are commonly referred to by our courts as easements. Davis v. Skipper, 125 Tex. 364, 83 S.W.2d 318, 321 (1935); Williams, Restrictions on the Use of Land: Equitable Servitudes, 28 Tex.L.Rev. 194, 195 (1949). Under these circumstances, we think the better view is that the purchaser of the benefitted land may enforce the restrictions even though, at the time he purchased the land, he was ignorant of their existence. Cf. Rogers v. Zwolak, 12 Del.Ch. 200, 110 A. 674 (1920); 5 Powell, Real Property, Section 679, pp. 207–08 (1971).

The judgment of the trial court is affirmed.